UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 21-10893-RGS

ARK NATIONAL HOLDINGS LLC

v.

WE CAMPAIGN LLC, TITAN DIGITAL LLC,
WEOFFERS LLC, and ARMEN YOUSSEFIAN

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

December 15, 2021

STEARNS, D.J.

Defendants WeCampaign LLC, WeOffers LLC, and Armen Youssefian are seeking dismissal of the Second Amended Complaint (SAC), brought by plaintiff ARK Holdings LLC. Defendants argue that ARK has failed to state a claim upon which relief may be granted. Upon review of the parties' briefs, the court will allow-in-part and deny-in-part defendants' motion.

## BACKGROUND

ARK owns and manages multiple behavioral health centers, which provide drug and alcohol rehabilitation services. SAC ¶ 2. Northeast Addiction Treatment Center, LLC (NEATC), based in Quincy, Massachusetts, is one such health center. *Id.* ¶ 20. In 2017, Richard

McDonald, ARK's co-owner, hired Youssefian, the managing member of WeCampaign, to "curate [ARK's] Digital Assets, coordinate online marketing activities, drive traffic to the Centers, analyze the Customer Data, and grow NEATC's brand." *Id.* ¶¶ 33-39. ARK utilizes a third party, Call Tracking Metrics, LLC (CTM), to capture and preserve data about all in-bound phone calls to ARK's call centers, including the callers' names and phone numbers. *Id.* ¶¶ 25-28. Youssefian and WeCampaign were granted access to NEATC's CTM account, allowing them to examine NEATC's customer data. *Id.* ¶ 39.

On November 18, 2018, WeCampaign set up a CTM username that downloaded a call log for the NEATC call center each Sunday and exported the data to an email domain owned and controlled by Youssefian. *Id.* ¶ 41. Over a period of several years, defendants imported 244 call logs from ARK's CTM account. *Id.*

On December 15, 2018, Youssefian signed a Statement of Understanding with McDonald and ARK's other co-owner, Pete McLoughlin, giving Youssefian a one-third ownership interest in ARK's health centers in exchange for Youssefian's exclusive commitment to ARK's business endeavors. *Id.* ¶¶ 49-50. This agreement was formalized in an Operating Agreement signed on December 31, 2019, in which Youssefian agreed not to compete with ARK and to keep ARK's proprietary information confidential.

2

*Id.* ¶ 64. Additionally, Youssefian executed a Profits Interest Award Agreement (backdated to December 1, 2019), promising to "devote his full business time, attention and efforts to the business affairs" of ARK, *id.* ¶ 62, and he signed a Buy-Sell Agreement declaring that his common units were subject to purchase by ARK in the event of Youssefian's termination for cause, *id.* ¶ 66. On November 1, 2019, WeCampaign executed a Digital Marketing Agreement undertaking to provide digital marketing and data reporting services "exclusively" to ARK and to keep "Proprietary Information" – including market information, contacts, and customer lists – confidential. *Id.* ¶¶ 53-54, 57. Defendants' practice of downloading ARK's call logs continued unabated despite these agreements. *Id.* ¶ 41.

ARK alleges that Youssefian and WeCampaign "failed to deliver" on their promise to "take ARK to the top of Google's search results." *Id.* ¶ 84. As a result, ARK states that it "had to drive admissions [to its Centers] through paid media including purchasing customer leads from lead aggregators." *Id.* ¶ 85. When Eric Mitchell was installed as ARK's Chief Revenue Officer, he became "suspicious at the disparity between the exorbitant fees ARK was paying WeCampaign and the resulting traffic to the Centers' web sites." *Id.* ¶¶ 87-88.

Mitchell initiated an audit of ARK's CTM account and learned that defendants had been routinely downloading ARK's call logs. *Id.* ¶ 90. Further, American Addiction Centers, Inc. (AACI) – the entity that owns the directory website "Rehabs.com," *id.* ¶¶ 29-30 – informed ARK that individuals at WeCampaign were managing accounts for several businesses other than ARK on Rehabs.com, *id.* ¶ 91. Mitchell also "suspected the authenticity of" defendants' invoices, "because of the lack of specificity in expenses, the lack of back up documentation, and the multiple 'round numbers' for reimbursable costs." *Id.* ¶ 104.

ARK then discovered Youssefian's ownership of WeOffers, a business that advertises a "cost-effective approach to generating quality leads" of individuals seeking behavioral health services. *Id.* ¶ 46.[1] ARK asserts that WeOffers is a "shadow firm" utilized by Youssefian to sell ARK's customer data to competitors. *Id.* ¶ 92. ARK further learned that call logs were being exported from its CTM account to email addresses ending in "@weoffers.com." *Id.* ¶ 83. ARK asserts that because defendants had no legitimate reason for exporting the call logs, *id.* ¶ 43, "[p]ulling Call Logs

---

[1] The SAC avers that Youssefian never disclosed the existence of WeOffers to the other members of ARK. *Id.* ¶ 93.

every week like WeCampaign was doing is consistent with one thing and one thing only: selling the Customer Data as leads to competitors." *Id.* ¶ 45.

On April 15, 2021, ARK terminated Youssefian for cause. *Id.* ¶ 106. ARK filed this lawsuit against defendants on May 27, 2021. *See* Compl. (Dkt # 1). On September 14, 2021, ARK sent Youssefian a written tender offering to purchase his common units in ARK pursuant to the terms of the Buy-Sell Agreement. SAC ¶ 112. As of the filing of the SAC, Youssefian has not responded to the tender offer. *See id.* ¶ 114.

## DISCUSSION

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). In most circumstances, the plaintiff need not demonstrate a "heightened fact pleading of specifics," but rather must present "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, facts that are "merely consistent with" a defendant's liability are

inadequate. *Id.* Further, the recitation of the elements of a claim, "supported by mere conclusory statements," is insufficient to establish facial plausibility. *Id.*

*(1) Counts I (Breach of Contract), II (Breach of Implied Covenant of Good Faith and Fair Dealing), and VI (Breach of Fiduciary Duty)*

Defendants argue that because ARK failed to proffer any "well-pleaded allegations of an actual breach of any agreement or fiduciary duty or of any actual, cognizable damage thereby," Counts I, II, and VI of the SAC do not state a claim upon which relief can be granted. Defs.' Mem. (Dkt #49) at 7. The court disagrees. Defendants executed written agreements promising not to compete with ARK and to keep ARK's proprietary information – including its customer data – confidential. Accepting the factual allegations of the SAC as true, defendants' sale of ARK's customer data to generate leads for competing behavioral health businesses plainly constitutes a breach of these agreements, *see Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007), as well as a breach of the implied covenant of good faith and fair dealing inherent in any contract, *see, e.g., Uno Restaurants, Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). Further, Youssefian's alleged misappropriation of ARK's proprietary information for his own personal gain amounts to a breach of his fiduciary duty as a managing member of ARK. *See, e.g., Demoulas v. Demoulas Super Markets,*

6

*Inc.*, 424 Mass. 501, 535 (1997). ARK has also properly pleaded allegations of damage stemming from defendants' actions – namely, financial loss resulting from defendants' self-dealing.

Defendants contend that the court's reasoning for dismissing claims lodged against former defendant Aram Shirinyan compels a similar result here. However, while the First Amended Complaint failed to plead any facts suggesting that Shirinyan was selling ARK's customer data to other businesses, the SAC provides well-pleaded allegations that defendants were doing just that. Notably, the SAC alleges that WeOffers – a lead generating business for behavioral health centers owned by Youssefian – was receiving exported call logs from ARK's CTM account, SAC ¶¶ 46, 83, 92; and that AACI informed ARK that WeCampaign was managing accounts for several businesses other than ARK on Rehabs.com, *id.* ¶ 91. These additional facts, while not overwhelming, carry ARK's claims over the line that demarcates what is merely "possible" from that which is factually "plausible." *Iqbal*, 556 U.S. at 678.

*(2) Counts III (Fraud), IV (Fraudulent Misrepresentation), and VII (Unfair and Deceptive Practices)*

Defendants maintain that the SAC's claims alleging fraud (Count III), fraudulent misrepresentation (Count IV), and unfair and deceptive practices in violation of Mass. Gen. Laws ch. 93A (Count VII) fail to meet the Rule 9(b)

7

heightened pleading standard. When bringing claims involving fraud, "a party must state with particularity the circumstances constituting" the alleged fraud. Fed. R. Civ. P. 9(b). "In such cases, the pleader usually is expected to specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004). The court concludes that ARK has satisfied Rule 9(b)'s pleading standard with respect to Counts III and VII, but not Count IV.

"Under Massachusetts law, fraud requires that the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 357 (1st Cir. 2013). "Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001). Although "'false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable,' . . . statements about future events concerning the conduct of a business" are actionable if, "at the time [the defendant] made the statements [the plaintiff] relies on, [the defendant] had no intention of following through on them." *Brewster Wallcovering Co. v.*

*Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 601 n.45 (2007), quoting *Yerid v. Mason*, 341 Mass. 527, 530 (1960). A properly stated fraudulent misrepresentation claim essentially mirrors the necessary elements of a fraud claim. *See Masingill v. EMC Corp.*, 449 Mass. 532, 540 (2007).

Similarly, "a chapter 93A claimant must show that the defendant's actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury . . . to competitors or other business [persons].'" *Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989), quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 595 (1975). "In the context of disputes among businesses, where both parties are sophisticated commercial players, the 'objectionable conduct must attain a level of rascality that would raise an eyebrow to the rough and tumble of the world of commerce.'" *Ora Catering, Inc. v. Northland Ins.*, 57 F. Supp. 3d 102, 110 (D. Mass. 2014), quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 502 (1979).

Count III and Count VII share the same basic contention – namely, that Youssefian, both in his personal capacity and as a principal of WeCampaign, falsely represented to ARK while negotiating the Profits

Interest Award Agreement that he would not engage with any business venture other than ARK. Specifically, on November 25, 2019, Youssefian indicated that he was concerned about restrictive language in the Profits Interest Award Agreement concerning outside ventures. SAC ¶ 67. On December 19, 2019, McLoughlin pushed back on Youssefian's concerns, stating that Youssefian's time "should be 100% devoted to this venture," which McLoughlin considered to be "a very basic premise for . . . receiving the equity [Youssefian is] receiving IMO." SAC Ex. G at 5. McLoughlin further remarked that "[t]he fact that this . . . is a negotiating point for you is very troubling to me." *Id.* In an email response to McDonald and McLoughlin the same day, Youssefian wrote: "I shouldn't devote significant time to anything other than ARK! . . . I was hoping you'd trust that I'd keep my eye on the prize without you having to put that in writing." SAC ¶ 67. All the while, defendants continued to download ARK's customer data from CTM, while allegedly concealing the existence of WeOffers, Youssefian's other business venture.

      This statement, coupled with the underlying facts surrounding defendants' alleged misappropriation of ARK's data, is sufficient to surmount Rule 9(b)'s heightened pleading requirement. ARK states with particularity "the who [Youssefian], what [exclusive commitment to ARK],

10

where [email communication], and when [December 19, 2019] of the allegedly false or fraudulent representation." *Synopsys, Inc.*, 374 F.3d at 29. Moreover, the SAC clearly asserts that at the time Youssefian, as WeCampaign's principal, made the allegedly fraudulent statement, he had "no intention of following through on" his commitment and was in fact actively betraying it by exporting and selling ARK's customer data through WeOffers, *see Brewster Wallcovering Co.*, 68 Mass. App. Ct. at 601 n.45; that Youssefian's statement was made to induce McLoughlin and McDonald to execute an agreement allowing Youssefian to share in ARK's profits; and that McLoughlin and McDonald were in fact induced to execute a profit-sharing agreement with Youssefian. *See Woods*, 733 F.3d at 357. Moreover, Youssefian's allegedly unethical behavior – furthered by the actions of WeCampaign and WeOffers in systematically misappropriating ARK's customer data – resulted in "serious" financial injury to ARK. *Garrity Oil Co.*, 884 F.2d at 1513. Accordingly, Counts III and VII of the SAC state claims upon which relief may be granted.

The same cannot be said of Count IV, which states that invoices presented to ARK by WeCampaign and Titan Digital "contained intentional falsehoods in the form of fictitious and overinflated expenses." SAC ¶ 141. In support of this contention, ARK pleads only that the invoices lacked

specificity and contained "multiple 'round numbers' for reimbursable costs." *Id.* ¶ 104. This conclusory allegation, without more, would be insufficient even for standard pleading purposes, and it certainly does not state with particularity a specific false representation necessary to overcome the heightened pleading requirements of Rule 9(b).

*(3) Count V – Civil Conspiracy*

Defendants next argue that the SAC fails to elucidate the existence of a conspiracy between defendants, stating that defendants are all essentially under the control of the same legal entity – Youssefian. The court agrees. "To establish a civil conspiracy claim, a plaintiff must demonstrate that 'a combination of persons acted pursuant to an agreement to injure the plaintiff.'" *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 415 (2002), quoting Nolan & Santorio, Tort Law § 99, at 136 (2d ed. 1989). In cases where several "agents of the same legal entity make an agreement in the course of their official duties, . . . as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

Here, the SAC asserts that all the defendant organizations are either owned or controlled by Youssefian. *See* SAC ¶ 37 (Youssefian "formed and

was the managing member of WeCampaign"); *id.* ¶ 13 ("Titan Digital is a single, integrated enterprise with WeCampaign"); *id.* ¶ 14 ("WeOffers is an entity . . . owned and controlled by Youssefian"). Where, as here, "a multiple team of horses [are] drawing a vehicle under the control of a single driver" – i.e., Youssefian – there can be no conspiracy. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).

*(4) Counts VIII (Federal Defend Trade Secrets Act) and IX (Massachusetts Uniform Trade Secrets Act)*

According to defendants, the SAC fails to state claims of federal and state trade secret misappropriation because it does not describe the alleged trade secrets with the necessary level of specificity. The court is not convinced.

"Massachusetts trade secret law is nearly equivalent to the [federal] DTSA." *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 94 (D. Mass. 2019). "To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase, Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires that the trade

secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *T.H. Glennon Co., Inc. v. Monday*, 2020 WL 1270970, at *14 (D. Mass. Mar. 17, 2020), citing *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970). "The party asserting the claim must identify with adequate specificity the trade secret or proprietary information that was allegedly misappropriated by the defendant." *Ferring Pharm., Inc. v. Braintree Labs, Inc.*, 38 F. Supp. 3d 169, 175 (D. Mass. 2014).

The SAC identifies with appropriate specificity the proprietary information that was allegedly misappropriated by defendants. As pointed out by ARK in its opposition, "the SAC describes Customer Data as the name, geographic location, telephone [number], and call duration of in-bound calls place[d] by prospective patients to ARK's call centers, which ARK's vendor, CTM, records and stores for ARK." ARK Opp'n (Dkt # 50) at 22, citing SAC ¶¶ 24-28. This customer data qualifies as a trade secret because it is a compilation of information that "derives independent economic value from

not being generally known to, or readily ascertainable by proper means by, the public." SAC ¶ 166. *See Monday*, 2020 WL 1270970, at *14.

Further, the SAC demonstrates that ARK took reasonable steps to preserve the secrecy of its customer data and adequately alleges that defendants improperly breached their confidential relationship with ARK to appropriate and exploit the data. ARK paid CTM to securely store its customer data, *see* SAC ¶ 26, and ARK required that WeCampaign employees execute Confidentiality, Intellectual Property Rights, and Restrictive Covenant Agreements before granting those employees access to its CTM account, *see id.* ¶ 72. Youssefian and WeCampaign's alleged exportation and sale of ARK's customer data, if true, constitutes a breach of the confidentiality agreements with ARK. As a third party that – according to ARK – knowingly benefited from this confidentiality breach, WeOffers is culpable as well. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 507 (D. Mass. 1992) ("[A] third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of the trade secret.").

Finally, the SAC adequately discloses that ARK's customer data is "used in, or intended for use in," interstate commerce. 18 U.S.C.

§ 1836(b)(1). ARK "has three call centers in Massachusetts, Tennessee, and Florida." SAC ¶ 25. ARK utilizes the geographic location data obtained from these call centers to "assess marketing performance and develop its future marketing strategies." *Id.* ¶ 27. It therefore stands to reason that ARK utilizes its customer data for the purpose of developing an interstate marketing strategy based in part on the geographic location of its callers.

*(5) Count XVI – Unjust Enrichment*

Defendants maintain that ARK's unjust enrichment claim must fail because there are contracts between ARK, Youssefian, and WeCampaign that govern the parties' responsibilities to one another. The court concurs. "It is well settled that a claim of unjust enrichment 'will not lie where there is a valid [underlying] contract that defines the obligations of the parties.'" *Zelby Hldgs., Inc. v. Videogenix, Inc.*, 92 Mass. App. Ct. 86, 92 (2017), quoting *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 641 (2013). Although "it is generally permissible to pursue alternative theories at the pleading stage," *Cooper v. Charter Comms. Entm'ts I, LLC*, 760 F.3d 103, 112-113 (1st Cir. 2014), the SAC has incorporated the various contracts at issue as Exhibits B, C, D, E, F, and H, and defendants by and large do not contest their validity (save for Exhibit C, the Digital Marketing Agreement, *see* Sanctions Mem. (Dkt # 53) at 7). Thus, the court, "focus[ing] narrowly on [ARK's] complaint

along with [its] incorporated documents," can conclude that valid contracts exist among the parties that foreclose an equitable claim of unjust enrichment. *Id.* at 113.[2]

*(6) Counts X-XV, XVII-XXII – Equitable Remedies*

In Counts X-XV and XVII-XXII, ARK seeks a variety of equitable remedies, including contract rescission and reformation, disgorgement, declaratory and injunctive relief, and specific performance. Because these counts are remedies and not independent causes of action, they will be dismissed as independent Counts of the SAC. *See, e.g.*, *Woods*, 733 F.3d at 353 n.3. The court's dismissal of these claims is, however, without prejudice to ARK's right to pursue these remedies in one form or another if it prevails at trial.

---

[2] Despite the lack of a contract between ARK and WeOffers, the SAC does not plausibly demonstrate that ARK knowingly conferred a benefit on WeOffers and expected compensation in return – a foundational element of any unjust enrichment claim. *See Stewart Title Guar. Co. v. Kelly*, 97 Mass. App. Ct. 325, 335 (2020).

## ORDER

For the foregoing reasons, defendants' motion to dismiss is <u>ALLOWED-IN-PART</u> with prejudice as to Counts IV, V, and XVI and without prejudice as to Counts X-XV and XVII-XXII. Defendants' motion to dismiss is <u>DENIED</u> as to all other Counts.

                                  SO ORDERED.

                                  <u>/s/ Richard G. Stearns</u>
                                  UNITED STATES DISTRICT JUDGE